**No. 06-282C**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CHANT ENGINEERING CO., INC.**

**Plaintiff,**

**v.**

**THE UNITED STATES**

**Defendant.**

# PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND MEMORANDUM OF LAW

**MARC LAMER**
**Attorney for Plaintiff**

**Kostos and Lamer, P.C.**
**1608 Walnut Street**
**Suite 1300**
**Philadelphia, PA 19103**
**(215) 545-0570**

**May 5, 2006**

# *TABLE OF CONTENTS*

Page(s)

**Table of Contents……………………………………………………......................... i**

**Table of Citations……………………………………………………………………. ii**

**Plaintiff's Motion For Judgment On the Administrative Record………………..1**

**Plaintiff's Memorandum Of Law In Support Of Its Motion For Judgment On The Administrative Record…………………………………………………..1**

**I. Introduction…………………………………………………..... …… 2**

**II. Statement Of Facts………………………………………………..2**

**III. Discussion…………………………………………………….....2**

**A. Jurisdiction And Standard Of Revue…………………………..2**

**B. The Standards For Injunctive Relief…………………………..3**

**C. Chant Can Inarguably Demonstrate Success On The Merits……………………………………………………..3**

**D. Chant Will Suffer Irreparable Injury if A Permanent Injunction is not issued………………………………………..26**

**E. The Balancing of Harm Favors Chant………………………….26**

**F. The Public Interest Will Be Served By The Granting Of Permanent Injunctive Relief…………………………………..27**

**IV. CONCLUSION…………………………………………………….27**

***TABLE OF CASES, CITATIONS AND OTHER AUTHORITIES***

***Page(s)***

**Court Decisions**

*Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)……3, 22*

*Banknote Corp. of America v. United States, 56 Fed. Cl. 377, 380 (2003), aff'd 365 F.3d 1345 (Fed. Cir. 2004)…………………………………………………………………….2*

*Bean Dredging Corp. v. United States, 22 Cl. Ct. 524 (1991)………………………………23*

*C&G Excavating v. United States, 32 Fed. Cl. 231, 236 (1994)……………………………20*

*Cherokee Nation v. Leavitt, 125 S. Ct. 1172 (2005)………………………………………20*

*Data General Corp. v. Johnson, 78 F.3d 1556, 1552 (Fed cir 1996)……………………..23*

*Hunt Building Company, Ltd. v. United States, 61 Fed. Cl. 243, 279 (2004)……………...3*

*Info. Tech. & Application Corp. v. United States, 51 Fed. Cl. 340, 346 (2001), aff'd, 316 F.3d 1312 (Fed. Cir. 2003)…………………………………………………………..2*

*Parcel 49C Ltd Partnership v. Unites States, 31 F.3d 1147, 1152 (Fed Cir 1994)……...24*

*PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)…………………..3*

*Stapp Towing v. United States, 34 Fed. Cl. 300, 302 (1995)………………………………20*

*Thompson v. Cherokee Nation of Oklahoma, 334 F.3d 1075 1084 (Fed Cir 2003)……..20*

*TLT Construction Corp. v United States, 50 Fed. Cl. 212, 216 (2001)……………………3*

*TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996)………………………2*

*United Int'l Investigative Services v. United States, 41 Fed. Cl. 312, 323 (1998)………23*

**Decisions by the GAO**

*Executive Court Reporters, Inc., B-273981, 96-2 CPD ¶ 130 (1996)…………………….20*

*Hughes Georgia, Inc., B-272526, 96-2 CPD ¶ 151 (1996)………………………………...20*

*Possehn Consulting, B-278579, 98-1 CPD ¶ 10 at 4-5 (1998…………………………......23*

**Regulations**

*48 CFR § 15.306 (c)(1)……………………………………………………………………3*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **Chant Engineering Co., Inc.** | ) | |
| | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **No. 06-282C** |
| | ) | |
| | ) | |
| **The United States** | ) | |
| | ) | |
| **Defendant** | ) | |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Plaintiff Chant Engineering Co., Inc. hereby moves the Court, pursuant to RCFC 56.1, for Judgment on the Administrative Record. Plaintiff seeks permanent injunctive relief enjoining performance of the contract awarded as a result of Solicitation W912NW-05-T-0063, and directing Defendant to evaluate the offers in strict accordance with the evaluation factors in the solicitation and on an equal basis.

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

## I. Introduction

Chant Engineering Co., Inc. ("Plaintiff" or Chant") has moved for judgment on the Administrative Record ("AR"), sustaining its protest against award of a contract by the Department of the Army/Corpus Christi Army Depot ("CCAD") to Dayton T. Brown, Inc. ("DTBI") arising out of CCAD Solicitation No.W912NW-05-T-0063 ("the Solicitation") for three (3) General Purpose Hydraulic Test Stands ("Test Stands"). Chant submits this Memorandum of Law in support of its motion. Chant seeks a

permanent injunction directing CCAD to reevaluate offers submitted in response to the Solicitation in strict accordance with the factors specified and on an equal basis.

## II. Statement Of Facts

For its Statement of Facts, Chant hereby incorporates "Plaintiff's Statement of Facts" submitted herewith.

## III. Discussion

### A. Jurisdiction And Standard Of Revue

The Court of Federal Claims has jurisdiction to review post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1). The Court reviews an agency's actions in a bid protest under the standards in § 706 of the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to overturn agency actions that are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The protestor must demonstrate that the agency's actions were without a rational basis or in violation of procurement law or procedure. Info. Tech. & Application Corp. v. United States, 51 Fed. Cl. 340, 346 (2001), aff'd, 316 F.3d 1312 (Fed. Cir. 2003). A "protester's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a 'best-value' procurement." Banknote Corp. of America v. United States, 56 Fed. Cl. 377, 380 (2003), aff'd 365 F.3d 1345 (Fed. Cir. 2004); see also TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996) ("To prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.") To demonstrate prejudice, "the protester must show that there was a substantial chance it would have received the

contract award but for that error. Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999).

**B. The Standards for Injunctive Relief**

The Court may issue a permanent injunction if a plaintiff establishes by a preponderance of the evidence that: (1) it has achieved actual success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government and the intervenor; and (4) granting the injunction serves the public interest. PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); Hunt Building Company, Ltd. v. United States, 61 Fed. Cl. 243, 279 (2004).

**C. Chant Can Inarguably Demonstrate Success On The Merits**

It is a "fundamental principle of government procurement … that [contracting officers] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation." TLT Construction Corp. v United States, 50 Fed. Cl. 212, 216 (2001). When Government procurement personnel favor one offer over another they violate FAR 15.306 (c)(1), which prohibits conduct that "favor[s] one offer over another." See 48 C.F.R. §15.306 (c)(1). In the instant case, CCAD personnel favored DTBI over Chant in two (2) ways:

(1) by evaluating Chant's technical proposal against requirements not set forth in the Solicitation or Specification, CCAD favored DTBI; and

(2) by evaluating Chant's proposal differently from that of DTBI against requirements that were set forth in the Solicitation or Specification CCAD again favored DTBI.

As noted in Chant's Statement of Facts, the Solicitation stated that there were two (2) technical evaluation factors, both of which, when combined, were

"significantly more important" than price: "technical capability of the item offered to meet the Government's requirement," and "past performance." See Administrative Record ("AR") 29. The "Government's requirement," clearly refers to the "Specification For General Purpose Hydraulic Test Systems," detailing the performance requirements of the test stands and set forth at pages 22 through 31 of the Solicitation (since there is nothing else wherein the "Government's requirement" is stated). See AR 46 through AR 55.

The record makes clear that the CCAD evaluations of the Chant and DTBI proposals were conducted in a way that favored DTBI over Chant. To be sure, Chant is not suggesting that Mr. Carrow (who conducted the initial evaluations and participated in the reevaluation) intentionally favored DTBI. Chant assumes his previous experience with DTBI caused him to view things in its proposal in ways that he did not view Chant's.

*1. Chant's proposal was evaluated against criteria that were not set forth in the Solicitation and/or Specification, resulting n the evaluation favoring DTBI.*

Perhaps the most egregious example of CCAD's favoring of DTBI involves the DITSCAP issue (Question No. 7 put to Chant in the reevaluation). As noted in Plaintiff's Statement of Facts, upon reevaluation Chant was questioned as to whether it had "met" the DITSCAP requirement, "in accordance with AR 25-1" in previous design and manufacturing. AR 462. Chant's reply (AR 459, No.7) indicated no previous experience with DITSCAP, which was one of the issues cited by the Committee and in the Contracting Officer's March 24 letter as a reason for denying the award to Chant. AR 456, AR 453.

The only DITSCAP requirement is set forth at paragraph C4.6.5 of the Specification ("DITSCAP and Networthiness Requirements"). It reads:

> C.4.6.5.1 The automated test equipment (ATE) must meet the DOD Information Technology Security Certification and Accreditation Process (DITSCAP) in accordance with AR25-1. A certificate [sic] of Networthiness (CON) shall be provided at acceptance of the test equipment.

AR 50.

As is readily apparent, there is no requirement for the contractor to have previously met the DITSCAP the DITSCAP requirement. Chant's original proposal addressed C4.6.5.1 (AR 216), and was adjudged to be compliant in the initial evaluation by Carrow. See AR 282. Yet, on the reevaluation, as noted above, Chant's lack of previous experience was cited as a non-compliance with the Specification by the Committee and the Contracting Officer. See AR 456 and AR 453.

Chant would also respectfully direct the Court to the DTBI proposal's discussion of the DITSCAP requirement:

> The Model LE600R will meet the DOD Information Technology Security Certification and Accreditation Process (DITSCAP) in accordance with AR 25-1. A certificate [sic] of Networthiness (CON) shall be provided by Dayton T. Brown, Inc. during acceptance of the test equipment at CCAD. <u>It will be CCAD's responsibility to support Dayton T. Brown, Inc. in meeting the requirement of AR 25-1</u>.

AR 397 (emphasis supplied). Clearly DTBI's proposal does not indicate any previous meeting of DITSCAP; the wording merely "parrots' the language in the Specification, even to the point of the apparent mistaken use of a lower case "c" in "certificate." Indeed, the final sentence of the section ("It will be CCAD's responsibility to support [DTBI] in meeting the requirement of AR25-1.") strongly suggests DTBI has not previously met the requirement. Finally, the requirement that CCAD "support" DTBI in meeting the DITSCAP requirements would appear to shift,

at least in part, the obligation of complying with DITSCAP from DTBI to CCAD. Yet, no questions were put to DTBI on this issue (*e.g.*, "what support does DTBI contemplate as necessary for it to satisfy the DITSCAP requirement?") and its proposal was adjudged compliant in that area. See AR 259.[1]

Question 3 provides another example of Chant having been evaluated against requirements that are not part of the Specification. Question 3 states:

> C4.2e – Has Chant designed and built Test Equipment with a Universal Source: Drive Current +/- 20mA DC single Channel (programmable) and a DC Power Supply: Voltage 0 to 40 VDC @ 20 AMPs and a LVDT Power Supply: Dual Channel 400 Hz all in a single test system that is automated and controlled by the application software.

AR 455. Here then is the referenced section of the Specification:

> C4.2 Equipment performance. The following is the minimum performance characteristics of the General Purpose Test System:
>
> e. Electrical Test Supplies — Universal Source Drive DC Single Channel (programmable) DC power supply: Voltage 0 to 40 VDC @ 20 AMPS LVDT Power Supply Dual Channel 400 Hz, 26 VAC.

AR 47. Once again, nothing in the cited section of the Specification requires the contractor to have constructed the precise configuration on a previous occasion. Moreover, there is no mention in the cited section of, "all in a single test system that is automated and controlled by the application software."

[1] As noted previously, DTBI's proposal was evaluated by Carrow as "meet[ing] the statement of work 100%." See AR 221

Notwithstanding Question 3 being outside the specification requirements, Chant provided an answer:[2]

> We have built hydraulic servo valves which provide variable current (± 20mA) to drive servo valves and which power and measure. LVDT signals. A programmable DC power supply up to 40VDC @ 20 amps is a standard commercial test item which will be included in our test stands. We have used electrical power supplies in numerous and varied combinations supplied to Government and commercial customers; while the exact combination required by CCAD is not identical to those we have previously supplied, it is not dissimilar either.

AR 459. Chant's response did not satisfy the Committee, which concluded:

> Did not answer the question. No mention of being automated and controlled by the application software (i.e. 488 bus used).

AR 455.

Once again, Chant was judged non-compliant for something that is not mentioned anywhere in the Specification (or the Solicitation). Further, the "toss-in" reference to "488 bus" ("488 bus" being a means of communication) shows the arbitrariness of the reevaluation: neither the Specification nor Question 3 makes any reference to "488 bus." Finally, nowhere in the DTBI proposal does there appear to be any mention of, "all in a single test system that is automated and controlled by the application software."

Question 8 put to Chant in the reevaluation was as follows:

> C4.6 Describe how Chant's computer will be capable of supporting existing calibration equipment.
> .

AR 462.

[2] Counsel for Chant advised CCAD's counsel of Chant's concern that a number of the questions seemed outside of the Specification, but wee being answered nevertheless. See Exhibit "L" to Declaration of Philip Chant, filed with Plaintiff's Motion For A Temporary Restraining Order.

Once again, CCAD has cited a section of the Specification ("C4.6 Computer") that has no requirements. This is once again shown by Carrow's initial review of both the DBTI and Chant proposals. In each case C4.6 is marked "n/a" (not applicable) under compliance see AR259 and AR 263. Moreover, nowhere in the entire section under C4.6 C4.6.1 C4.6.2, C4.6.3, C4.6.32, C4.63.2, and C4.6.3.3 is there any reference to "supporting existing collaborator equipment." See AR 49- AR 50.

Notwithstanding the lack of any requirements under C4.6, Chant responded to the Committee's question:

> 8. Details of the Government's existing calibration equipment are not described in the specification. However, normal calibration procedures are to record simultaneous values from the calibrator and the item being calibrated in order to generate correction values for readings taken from the test stand. Every Chant Test Stand provided on previous Government contracts has supported Government calibration equipment. Chant provides detailed calibration procedures with each test stand.

AR 459. The fact that C4.6 contains no requirements and CCAD's "existing calibration equipment" is not described anywhere in the specification did not seem bother the committee. According to the Committee, Chant should have inquired in those areas:

> Chant did not ask for details or date on the calibration equipment during the question/answer period that followed the site visit making it difficult to answer this question at this time, gave generalities and no specific details pertaining to the question. Committee feels <u>Chant did not elaborate on how it was going to deal with proprietary information.</u>

AR 456 (emphasis supplied). In other words, Chant failed to ask about something that is not described in C4.6 (or anywhere else for that matter) thus making its answer to Question 8 unacceptable. Chant would also point out that C4.6 makes no

reference to "proprietary information;" nor did Question 8 mention "proprietary information." Yet Chant's answer was considered unacceptable for not addressing it.

Another example of CCAD's holding Chant to evaluation criteria that are not in the Solicitation/Specification and thus favoring DTBI over Chant is demonstrated by questions 11 and 12 put to Chant in the reevaluation. Those questions were as follows:

> 11. C5.0 Has Chant designed and built test system's (sic) that are computer automated, testing servo-actuators, using a pre-existing customer provide [sic], automated test procedure?
>
> 12. C5.0 Has Chant designed and built test system's (sic) that performed operator hands-offs automated testing of aircraft electro-hydraulic components that uses [sic] computerized data acquisition and control techniques in which the pressure and flows are controlled by purely by [sic] the automated test procedure. If yes, please provide specific examples of the test product.

AR 456.

Initially, Chant would make two (2) points. First, Section C5.0 of the Specification is a title section ("C5.0 Asset Test Capabilities Sets"). There are no requirements, performance or otherwise in C5.0; all the requirements are in the succeeding sections, i.e., C5.1, C5.1.1 and C5.1.2. See AR 51. Indeed, Carrow's initial evaluation states as much; he put "n/a" (*i.e.*, not applicable) in the "compliance" block next to C5.0 in both the evaluation of DTBI's proposal (AR 278) as well as that of Chant (AR 282). Secondly, nothing in C5.0 or the subsections thereunder (C5.1, C5.1.1 and C5.1.2) indicates a requirement for previous experience.[3] Nevertheless, Chant addressed the question:

> 11. Chant has designed and built automated computerized servo valve test stands which embody customer provided test procedures. Such test stands have been purchased in the past by U.S. Military Departments, including the U.S. Air Force and foreign militaries,

[3] Which might explain why the Committee cited C5.0 as the section supporting the questions.

such as the ROKAF for depot level maintenance facilities.

> 12. Chant has designed and built Military and industrial test stands in which pressures and flows are atomically set by computerized test procedures. These test stands for testing aerospace components. Test products: Electro hydraulic servo valves.

AF 459-AR 460. However, the committee concluded that Chant did not answer the questions:

> 11. Did not answer. Chant gave generalities and no specific details pertaining to the question. Nothing mentioned in their answer about "testing servo-actuators" or "automated test procedures.".
>
> 12. Did not answer. Chant gave generalities on no specific details pertaining to the question. Nothing mentioned in their answer about examples of the test procedure, DMWR/TM used. Components tested.

AR 456. In other words, Chant was found non-compliant for Questions 11 and 12 for not showing actual experience, which is not a requirement under C5.0.

Chant would respectfully direct the Court to DTBI's proposal in the area of C.5.0. First, the full section of the Specification reads as follows:

> C.5.0 ASSETS TEST CAPABILITIES SETS
>
> C.5.1 Test Set DMWR's 55-1680-355 &55-1680-356
>
> C.5.1.1 Adapters and Indicators. All necessary adapters and indicators required to connect one (1) Cyclic or Directional Actuator to the test using the test system per DMWR's 55-1680-355 & 55-1680-356 shall be provided. These adapters/indicators shall include (as required):
>
> 1. Qty. (1) set electrical cable/connectors
> 2. Qty. (2) set hydraulic hose/fittings
> 3. Qty. (3) set dial indicators
>
> C.5.1.2 Semi-automated Test Procedure. A semi-automated test procedure to perform the testing for the Cyclic or Directional Actuator per DMWR's 55-1680-385 & 55-1680-356 shall be provided with the test system.

AR 51 (emphasis supplied). DTBI's proposal then addresses the requirements as follows:

> 3.1.2.4 UNIT UNDER TEST DMWR'S 55-1680-355

& 55-1680-356

3.1.2.4.1 Adapters and Indicators

All necessary adapters and indicators required for interface of one (1) Cyclic or Directional Actuator to the test system and test using the test system per DMWR's 55-1680-355 & 55-1680-356 shall be provided by CCAD. These adapters/indicators shall include (as required):

1. Qty. (1) set electrical cable/connectors
2. Qty. (2) set hydraulic hose/fittings
3. Qty. (3) set dial indicators
4. Qty. (4) test fixture

3.1.2.4.1 Semi-automated Test Procedures

Dayton T. Brown, Inc. will deliver one (1) each semi-automated test procedure to perform the testing for the Cyclic or Directional Actuator per DMWR's 55-1680-355 & 55-1680-356

AR 397 (emphasis supplied)[4]

Putting aside the fact that DTBI's proposal contained no indication of experience in this area, the proposal was not compliant with the terms of the Specification; it obligated CCAD to supply all "necessary adaptors and indicators" for Section C5.1.1. Yet, DTBI's proposal was evaluated by Carrow as being "compliant" with that section of the Specification. See AR 278. [5] Arguably, DTBI may have misinterpreted the words "shall be provided" to mean "shall be provided [by CCAD]." As submitted, however, DTBI's proposal was non-compliant for C5.1.1 and could not be the basis for an award without at least a question from CCAD as to DTBI's understanding of C5.1.1. Yet such no question was put to DTBI.[6]

[4] DTBI's proposal numbered the sections differently from the Specification. A "conversion chart" was provided to CCAD. AR 375-AR 37

[5] See also DTBI "meets the statement of work 100%." AR 280

[6] Since CCAD awarded DTBI the contract against the proposal submitted, DTBI will be entitled to demand a price adjustment in the event CCAD requires it to supply the actuators and indicators.

Questions 13 and 14 put to Chant in the reevaluation were as follows:

> 13) C6.0 Has Chant designed and built Remote hydraulic Power Supplies that produce 500-6000psig, up to90 gallons per minute with an adjustable temperature from 100%F to 160%F in which one power supply supports two (2) each General Purpose Test systems?
>
> 14) C6.0 How is Chant going to interface with the existing Hydraulic Power Supply?

AR 463

As with questions 11 and 12, the Committee once again cited a section of the Specification that is, essentially, a section heading ("EQUIPMENT REQUIREMENTS – REMOTE HYDRAULIC POWER SUPPLY (RHPS);" see AR 51. With respect to question 13, there is no requirement anywhere in Section C6.0 (or the subsections thereunder) that the contractor have previously "designed and built" the specific items being procured by the Solicitation. With respect to question 14, Section C6.0 contains no requirement for "interface with the existing Hydraulic Power Supply." [7]

Chant responded to the Committee's questions 13 and 14. AR 460. The Committee's conclusion was that Chant's answer to No.13 was "vague," but satisfactory. AR 457. For question 14, however, the Committee stated that Chant, "Did not answer," and that Chant "Did not elaborate on how it was going to deal with proprietary information."

The Committee's conclusion as to Question 14 again demonstrates that Chant is not being evaluated against what is in the Specification. Aside from there being no reference in C6.0 to "interface with existing Hydraulic Power Supply," there is also no reference to "proprietary information." See AR 51. Even more incredible,

[7] In the initial evaluation Chant was judged to be "compliant" for all the requirements in the subsections of Section C6.0 See AR 264. As with the other "preliminary sections of the Specification, Carrow's initial evaluation listed "n/a" (not applicable) for C6.0, obviously since that section lacks specific requirements for the contractor to meet.

perhaps, is the fact that the Committee never asked about "proprietary information" in Question 14. In other words, Chant's response was deemed unsatisfactory for failing to address something that is not in the specification and was not part of the question.

Finally, Question 14 and the Committee's conclusion once again demonstrates how the evaluations favored DTBI over Chant. DTBI's proposal addressed Section C6.0 of the Specification in Sections 3.2.2, 3.2.3, 3.2.4 and 3.4.6 (AR 398-AR 404). [8] Nowhere does DTBI's proposal address "interface" with existing power supply. Yet DTBI's proposal was deemed compliant without any questions being asked.[9]

Clearly, with respect to Questions 3,7,8,11,12,13 and 14, Chant was evaluated against "unstated" evaluation criteria, thereby favoring DTBI, in violation of CCAD's duty to "consistently apply the evaluation factors listed in the solicitation." TLT Construction Corp. v United States, supra, at 216 (emphasis supplied)

*2. Even in areas that were requirements under the Specification, Chant's proposal was evaluated differently than that of DTBI.*

Question 1 put to Chant in the reevaluation was:

> C.2.4 Describe how Chant is going to be compatible with existing General Purpose test fixtures and ATP's.

AR 462. Section C2.4 of the Specification reads:

> C2.4 Provide complete compatibility with existing CCAD general purpose test fixtures, automated test procedures and with the existing local area

[8] According to the "conversion chart" at AR 376-AR 377.

[9] Defendant could argue that CCAD knew of DTBI's capabilities, meaning it was not necessary for DTBI to detail the how's and why's of its design. However that does not relieve DTBI of submitting a complete proposal, since proposal are supposed to be evaluated solely on the basis of the information submitted. See e.g., Possehn Consulting, B-278579, 98-1 CPD ¶ 10 at 4-5 (1998).

AR 46. Chant responded to Question No. 1 as follows:

> These general purpose hydraulic test stands develop hydraulic pressures and flows sufficient to perform testing on actuators, valves, accumulators and the like. They also provide electrical power supplies. The pressures, flows and electrical power have been defined for these test stands (para. C.4.2) and will be provided by the test stands proposed by Chant Engineering. Test fixtures secure test and permit connection to the appropriate hydraulic power sources, typically pressure, return and drain lines. Ports for these connections will provide on the front of the test stands, with different pressure and flow capabilities as specified. Test items such as actuators, which in addition require electrical supplies, will connect to readily accessible electrical terminals. Thus our test stands will be compatible with the existing test fixtures. The list of items to be tested on these test stands has only been stated in general terms (para. C.1.1) and we do not yet have access to the ATP's for the test items, beyond the two SWRM's for actuators. However, we have supplied automated test equipment in the past, and propose to configure the ATP's control configurations after receiving details for the specific ATP's control requirements.

AR 458. The Committee's conclusion in the reevaluation was that Chant:

> Did not answer the question. Gave generalities and no specific details pertaining to the question.

AR 455

Chant would ask the Court to examine DTBI's proposal in regards to the same specification section. According to the "conversion chart," the referenced sections of the proposal are 3.0, and 4.0; there is also a comment "DTBI will provide the same equipment currently installed at CCAD." AR 376. Section 4.0 of the DTBI proposal" is a "Milestone schedule;" it makes no reference to "compatibility with existing General purpose test fixtures." AR 405-AR 409. Section C3.0, on the other hand, does make reference to compatibility. On page A-6, under Instrumentation Calibration of Units, it states:

> MODEL LE6000R has the following instrumentation, display of units and is capable of interfacing with existing CCAD calibration equipment some of which was supplied

> and manufactured by [DTBI]

AR 380. Thus, the only reference to interfacing with CCAD's existing equipment is that DTBI's new equipment is "capable" of such interfacing. Nowhere does DTBI state how the interfacing is to be accomplished or who is responsible for accomplishing it. Yet DTBI was judged compliant for C2.4 without any question being asked. AR 277.[10]

Question 5 put to Chant was:

> C4.3.1.2 Describe how Chant's Test System will use the existing Government Supplied Master Reference during calibration

AR 462. The reference to the "Government supplied master reference standard" is contained at the end of Section C4.3.1.2 in the Specification. It reads

> Calibration of the flow transducers shall be accomplished through the test system supply and return ports with the exception of the Leakage Flow master while using the existing Government supplied master reference standard.

AR.48. Chant's proposal addressed the Government supplied master reference standard. (AR 214), and the proposal was judged compliant for C4.3.1.2 in Carrow's initial evaluation. See AR 282

.

Chant then responded to the Committee's question No. 5 as follows:

> 5. The Government has provided no data on its Master Reference Standard. However in accordance with para. C.4.3.1.2, the Government's Master Reference Standard flow meter will be connected to the supply and return ports of the test stand. Simultaneous flow readings from the test stand flow meters and the Government's Master Reference Standard will be recorded at the computer into a "look-up" t

[10] Interestingly, while in the "conversion chart" DTBI cites sections 3.0 and 4.0 of its proposal as corresponding to C2.4 in the Specification (AR 376) those are not the portions of the proposal cited by Carrow in his evaluation as showing DTBI's compliance with C2.4. Carrow cites "Page ii" as the portion of the proposal showing such compliance. See AR 277. Page ii, however, is an "Executive Summary;" it has no specific information on the items to be supplied beyond, "our products fully comply with the requirements of the Solicitation . . . ." See AR 376.

> able, providing connection values used by the data acquisition system to correct test stand flow readings.

AR 459. However, the Committee found the response to be unacceptable:

> Chant did not ask for details or data on the Master Reference Standard during the question/answer period that followed the site visit making it difficult for them to answer this question at this time. Gave generalities and no specific details pertaining to the questions.

AR 455. In other words, Chant should have asked about the Government Master Reference Standard during the site visit. Because it did not, CCAD judged Chant's response to be unacceptable "generalities."

Chant would again ask the Court to compare Chant's proposal in this area (AR 214) to that of DTBI. DTBI addressed the master reference standard in a Note on page A-5.

> Calibration of the flow transducers are accomplished through the test system supply and return ports with the exception of the Leakage Flow meter while using the existing Government supplied master reference standards.

AR 379. In other words, DTBI addressed the master reference standard in almost the same words as Chant. However, its proposal was accepted without question.

Question 6 put to Chant in the reevaluation was:

> C4.6.1c Describe how Chant will address the interface computer communications with distributed control components, e.g. controllers, and System 10.

AR 462.

In the initial evaluation, Carrow found Chant's proposal to be compliant for the entire section C4.6.1 (see AR 282); nevertheless Chant was asked to describe how it would address the interface. Chant responded:

> System 10 communications to and from our computer will go via RS232 interface. Controllers will recognize signals from System 10 hardware.

AR 459. The committee decided that "Chant's answer was very weak." AR 455[11] However, the only reference to "interface" in DTBI's proposal is in 3.1.2.3 entitled "Model LE6000R Software Application program;" therein it states:

> The LE6000R is provided with the following software application programs which conform to and interface with the existing software in the Model DE6000R General purpose hydraulic test system presently installed at CCAD by [DTBI].

AR 394. There is no reference in any of the sections identified in the "conversion chart" (AR 376) as corresponding to C4.6.1, *i.e.*, 3.1.2.2.3 or 3.1.2.3 to "controllers and System 10." Once again Chant is being evaluated to a different standard than DTBI.

While Chant's response to Committee question No. 2 ("C3.1 Describe how Chant is going to achieve the 85Db's (sic) noise level at the operators (sic) work station?"), was considered acceptable, the question again demonstrates the arbitrariness of the evaluation.

In the original evaluation of Chant's proposal, Carrow found Chant to be non-compliant for Section C3.1 of the Specification, but not for the "85 db's at the operators work station" requirement. According to Carrow, Chant was non-compliant, because:

> Section 2.1 (page 3) [of Chant's proposal] Describes (sic) manual controls for supply/return pressure and static pressure. Is Chant aware the ATP for OH-58 actuators requires the test system to control all pressures & flows?

AR 262. Putting aside the fact that the portion of Chant's proposal referenced, *i.e.*, Section 2.1 (AR 209-AR 210), makes no reference to "manual controls for

[11] It is not clear whether "weak" was meant to mean "unacceptable," but the Contracting Officer decided as much. See AR 453.

supply/return pressure and static pressure," in the reevaluation the Committee chose not to ask the question raised in the initial evaluation by Carrow ("Is Chant aware the ATP for OH-58 actuators requires the test system to control all pressures & flows?"); instead Chant was asked only about the noise requirements of C3.1. Yet, notwithstanding the fact that the Committee never asked Chant the question raised by Carrow in the initial evaluation, and the fact that Chant's answer to the question about the noise level satisfied it, the Committee again found Chant to be non-compliant for Section C3.1, stating as follows:

> Statement of work paragraph C3.1: Section 2.1 of proposal (page 3) describes manual controls for supply/return pressure and static test pressure. CCAD is asking for a fully automated test system. The existing ATP for OH-59 actuators requires the test system to control all pressures & flows? (sic)

AR 457.

> Question 9 put to Chant by the Committee was:
>
> C4.6.3.3. Described how Chant's application software shall conform to and interface with the existing software in the general purpose hydraulic test system presently installed at CCAD.

AR 462. The Specification requirement is as follows:

> C4.6.3.3 Application Software. Application Software shall conform to and interface with the existing software in the general purpose hydraulic test system presently installed at CCAD.

* * *

AR 50. Chant addressed this in its initial proposal (see AR 215) and was found to be "compliant" in the initial evaluation (see AR 282), nevertheless it responded to the Committee's question:

> 9. Chant's software is designed to produce screen displays similar to those present in the existing equipment. It is also designed to generate and print test reports in the existing format. The computer displays and logs test data, integrates distributed

> controls, runs test profiles, stores test runs, provides calibration screens, and also provides on-line operating and calibrating instructions. Data stored at the local area network via an Ethernet connection. Interfacing with existing software may also be performed via the Ethernet connection and LAN.

AR 459 (emphasis supplied). The Committee found Chant's response to be unacceptable, stating:

> Chant gave generalities and no specific details pertaining to the question. Nothing mentioned in their answer about "existing software."

AR 456 (emphasis supplied). Apparently, in this instance the Committee failed to read Chant's response to its question.

The Committee's conclusions on the reevaluation also demonstrate how Chant was evaluated against factors not in the Solicitation and how DTBI was favored thereby. The Committee wrote:

> Chant gave generalities and no specific details pertaining to the questions that were forwarded to them pertaining to their proposal. The committee wanted specific's [sic] on how Chant was going to address these issues. They did not do a good job in convincing the committee they are qualified in supplying the test equipment.
>
> Chant did not ask for details or data pertaining to equipment mention in the SOW during the question/answer period that followed the site visit making it difficult for them to answer some questions at this time. Chant proposal states the need for a post award site visit to discuss compatibility and design issues and are offering CCAD a test system design with serial number 0001. The SOW is asking for a off the shelf proven design.
>
> The committee feels Chant did not elaborate on how it was going to deal with proprietary information pertaining to existing software, test equipment, and calibration equipment.
>
> Statement of work paragraph C2.4: Chant failed to state how they are going to comply with compatibility issues. States on page 2 of their proposal they "will visit the site after award for the purpose of examining compatibility issues," a sign they do not fully understand the project. Existing equipment it must be compatible with, ATP's ect.[sic], are proprietary.

AR 457.

Chant would initially point out that the evaluation questions are focused not on the capabilities of the equipment offered, but rather on what they perceive as Chants "qualifications." However, the evaluation factors in the Solicitation were (i) technical capability of the item offered to meet the Government's requirement; [and] past performance." As to "past performance," there is a clear distinction between it and experience. See Hughes Georgia, Inc., B-272526, 96-2 CPD ¶ 151 (1996) and Executive Court Reporters, Inc., B-273981, 96-2 CPD ¶ 130 (1996).[12] See also John Cibinic, Jr. and Ralph C. Nash, Formation Of Government Contracts, 3rd Ed. at page 737:

> To determine a contractor's experience the question are: What have you done? and How many times or for how long have you done it? The question for past performance is: How well have you done it?

CCAD chose to make part performance rather than experience the evaluation factor; it cannot change course in the evaluation.[13]

Moreover, the Committee's criticism of Chant for suggesting a post award site visit "to discuss compatibility and design issues" and its assertion that CCAD wants "a (sic) off the shelf proven design," (AR 457), stands in stark contrast to its willingness to accept the same suggestions from DTBI. DTBI's proposal was considered acceptable despite the following statements included therein:

[12] While GAO decisions are not binding precedent for the Court, they are accorded deference. See Thompson v. Cherokee Nation of Oklahoma, 334 F.3d 1075 1084 (Fed Cir 2003), aff'd, Cherokee Nation v. Leavitt, 125 S. Ct. 1172 (2005).

[13] Arguably, the question of Chant's qualifications could be one of responsibility. However, if CCAD's rejection of Chant's proposal amounts to a finding of non-responsibility pursuant to FAR Subpart 9.1 (48 CFR § 9.1), CCAD would have had to refer the decision to the Small Business Administration for the possible issuance of a Certificate of Competency under FAR 19.602-1 (48 CFR § 19.602-1), since Chant is a small business (Declaration of Phillip Chant, submitted with Plaintiff's Motion For A temporary Restraining Order,¶ 2). See, e.g., Stapp Towing v. United States, 34 Fed. Cl. 300, 302 (1995); C&G Excavating v. United States, 32 Fed. Cl. 231, 236 (1994).

4.0 MILESTONE SCHEDULE

4.1 EVENTS

All work including design, fabrication, shipping, installation, acceptance testing and training will be accomplished twelve (12) months after receipt of order. The following paragraphs describe the Milestone Schedule.

4.1.1 Preliminary Design Review (PDR)

A preliminary design review will be held at the Dayton T. Brown, Inc. facility in Bohemia, New York. The preliminary design review will consist of a review of the Dayton T. Brown, Inc. proposed approach. Dayton T. Brown, Inc. will provide preliminary drawings on the major circuit assemblies and sub-assemblies for review.

Dayton T. Brown, Inc. shall coordinate configuration and testing procedures with CCAD's Information Technology Division, Directorate for Resources prior to Design Review. CCAD POC's will be provided by CCAD to Dayton T. Brown, Inc. prior to Design Review.

4.1.2 Critical Design Review (CDR)

A critical design review will be held at the Dayton T. Brown, Inc. facility in Bohemia, New York. The critical design review will consist of a review of the changes made on the Information presented at the preliminary design review. The critical design review will be held prior to the ordering of the test stand parts and components.

* * *

4.1.4 Validation Tests at Dayton T. Brown, Inc. The validation test procedure will be written Dayton T. Brown, Inc. and submitted at the preliminary design review (PDR). Validation testing at the Dayton T. Brown, Inc. facility in Bohemia, NY will be accomplished over five consecutive working days. Dayton T. Brown, Inc. will submit the validation test report after completion of all validation testing.

* * *

4.1.7 Installation

Installation in CCAD will be done by Dayton T. Brown, Inc. accordance with the final version of the Site Preparation Requirements/Installation Plan.

Dayton T. Brown, Inc. shall design, install and be responsible for furnishing all labor, parts, material and equipment for successfully accomplishing a

complete (turnkey) installation process shall be coordinated with CCAD POC to minimize interference with normal depot operations.

* * *

4.1.8 Validation Tests at CCAD

After completion of the installation at CCAD, Dayton T. Brown, Inc. will perform validation testing at CCAD. Validation testing at the CCAD Corpus Christi, TX will be accomplished over five consecutive working days.

Acceptance of network communications shall include a review of systems log files, visual inspection of system and network configurations, examination of network traffic emanating to and from the console, connectivity to network file system, ability to read and write to this file system, inspection of files to ascertain reliable transmission of both printer and delimited ASCII file sets. File sets will be examined to correlate data on printer file with delimited ASCII file.

Failure in network availability will be tested to ensure that logic provided scripts writes unique file sets to local storage on Model LE6000R computer.

* * * *

AR 406 – AR 408. (emphasis supplied). While it may be argued that DTBI has more “experience” than Chant in providing CCAD with the precise equipment being sought, its proposal makes clear that it will require several “design” meetings with CCAD personnel, prior to DTBI delivering its “off-the-shelf” product. CCAD’s willingness to accept from DTBI what it says is an demonstrates non-compliance on the part of Chant once again demonstrates CCAD’s favoring of DTBI over Chant

*3. Chant was prejudiced by CCAD’s actions favoring DTBI.*

In order to establish prejudice, Chant must show there was a substantial chance it would have received the contract award, but for CCAD’s errors. Information Technology and Application Corp. v. United States, 316 F.3d 1312, 1319 (Fed Cir 2003). It need not show it would have received the award only that it would have received the award only that it was in the zone of active consideration and had a reasonable likelihood of securing the award. Alfa Laval Separation, Inc. v. Unites

States, supra, at 1367; Data General Corp. v. Johnson, 78 F.3d 1556, 1552 (Fed Cir 1996).

In the instant case, had Chant and DTBI been evaluated equally against the requirements of the Solicitation, there would then have been the "Best Value" analysis contemplated in the "Evaluation" clause on page 5 (AR 29). In such an evaluation, even though price was significantly less important then technical, it was still a factor (as it must be in all procurements). In terms of price, Chant had a huge advantage: $844,072 (AR 177 – AR 178) versus $1,450,000 (AR 332 – AR 333), meaning DTBI's price was over SEVENTY (70%) PERCENT higher than Chant's. Clearly, the price differential was large enough to give Chant a reasonable chance at receiving the award (versus DTBI) in a cost-technical tradeoff.

**D. Chant Will Suffer Irreparable Injury If A Permanent Injunction Is Not Issued**

Plaintiff need not dwell on the irreparable injury issue. Given that the only monetary damages available to a disappointed bidder are bid preparation costs, loss of the revenue a contract would have produced (in this instance over $800,000) to Plaintiff is sufficient to constitute irreparable injury. See United Int'l Investigative Services v. United States, 41 Fed. Cl. 312, 323 (1998), Bean Dredging Corp. v. United States, 22 Cl. Ct. 524 (1991).

**E. The Balancing Of Harm Favors Chant**

On the issuance of balancing the harm to Plaintiff if no injunction is issued versus the harm to the Government if an injunction is issued, Plaintiff respectfully submits that the scale swings heavily in Plaintiff's favor. If no injunction is issued, Plaintiff will be irretrievably denied a contract for which it has at least the right to have its proposal evaluated fairly. On the other hand, there will be no harm to

CCAD if an injunction is issued. Plaintiff believes an evaluation that properly focuses on the requirements of the Specification may well save CCAD over $ 600,000. Moreover, as was stated during the initial telephone conference, CCAD currently has several functioning test stands, so it is not being denied the ability to perform its functions.

Finally, anticipating an argument, the fact that this matter is before the Court a second time should have no bearing on the question. It is only CCAD's failure to perform the reevaluation properly that has delayed completion of this procurement.

**F. The Public Interest Will Be Served By The Granting Of Permanent Injunctive Relief**

It is in the public interest for the Government to conduct fair procurement procedures and to give honest and fair consideration to all offers. Parcel 49C Ltd Partnership v. Unites States, 31 F.3d 1147, 1152 (Fed Cir 1994). In the instant case it is clearly in the public's interest for CCAD to evaluate the offer of Chant fairly, since the potential savings to the Government is over $600,000.

**IV. Conclusion**

Wherefore, for all the foregoing reasons, Plaintiff Chant Engineering Co., Inc. respectfully requests that the Court grant its Motion For Judgment On The Administrative Record, and permanently enjoin performance of the contract awarded to DTBI, pending a proper (*i.e.*, in accordance with the terms of the Solicitation) reevaluation of offers.

Respectfully submitted,

s/ Marc Lamer

MARC LAMER
Attorney for Plaintiff