# In the United States Court of Federal Claims

**No. 06-282C**
**Filed: January 10, 2007**[1]

* * * * * * * * * * * * * * * * * * *

**CHANT ENGINEERING CO., INC.,**

**Plaintiff,**

**v.**

**UNITED STATES,**

**Defendant.**

**and**

**DAYTON T. BROWN INC.,**

**Defendant-Intervenor.**

* * * * * * * * * * * * * * * * * * *

**Post-Award Bid Protest; Standing to Protest; Procurement of a Commercial, Off-the-Shelf System; Compatibility Requirements.**

**MARC LAMER**, Kostos & Lamer, Philadelphia, PA, for the plaintiff.

**MARLA T. CONNEELY**, Trial Attorney; **HAROLD D. LESTER, JR.**, Assistant Director; **DAVID M. COHEN**, Director, Commercial Litigation Branch; **PETER D. KEISLER**, Assistant Attorney General, Civil Division, Department of Justice, Washington, DC, for the defendant. **ALEX LOPEZ**, Corpus Christi Army Depot, Corpus Christi, TX, of counsel.

**DALE H. OLIVER**, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, for the intervenor; **JON COREY, RACHEL FISET**, also of Quinn Emanuel Urquhart

[1] This opinion was issued under seal on January 10, 2007, to afford the parties an opportunity to propose redactions. No redactions were proposed. The opinion was, therefore, unsealed on February 7, 2007.

Oliver & Hedges, LLP, of counsel.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

This is a post-award bid protest, filed by Chant Engineering Company, and arising from the award of a contract to Dayton T. Brown Inc. (DTBI) by the Corpus Christi Army Depot (CCAD), a United States Army unit. Prior to the issuance of the competitive solicitation at issue, CCAD had obtained approval to award a sole source contract to DTBI for three general purpose hydraulic test systems (test stands), one hydraulic power supply and the software necessary for interfacing with the existing equipment, computer networks, and calibration cart at CCAD. The record reflects that CCAD's current test stands and power supply had been acquired from DTBI in a sole source procurement in 1995. CCAD's February 7, 2005, Justification and Approval for this latest sole source to DTBI stated that, "Dayton T. Brown (DTB) is the only source that has the technical knowledge and proprietary engineering data to provide test systems that will provide utilization of current support equipment and will provide standardization for all test systems in the hydraulic test arena."

However, CCAD never issued the sole source contract to DTBI for the test stands. Instead, on April 8, 2005, CCAD issued solicitation W912NW-05-T-0063, as open to competition, which is the basis for the current protest.[2] The solicitation stipulated that all work was to be completed within twelve months of contract award, and that the contractor was to "[p]rovide complete compatibility with existing CCAD general purpose test fixtures, automated test procedures and with existing local area test system network." The solicitation required that the application software conform to and interface with CCAD's current test stand system software, and that the test equipment satisfy the DOD Information Technology Security Certification and Accreditation Process (DITSCAP).

---

[2] Counsel for both the plaintiff and the intervenor indicated that they believed that the solicitation was changed to an open competition because several potential offerors approached the government and encouraged opening the solicitation to competition. In fact, two contractors, in addition to DTBI, the original subject of the sole source justification, submitted offers in response to the solicitation (Chant and Power Supply International). In spite of this explanation, the defendant offers a less plausible basis: "[T]he solicitation was inadvertently converted to a competitive solicitation by the inclusion of FAR 52.212-2 [a clause titled 'Evaluation–Commercial Items (JAN 1999)'], which states that a best value analysis [of multiple proposals] would be conducted in awarding the contract." In any event, when three offers arrived in response to the competitive solicitation, CCAD proceeded to evaluate them in accordance with the competitive solicitation.

The solicitation sought "commercial items" in accordance with the Federal Acquisition Regulation (FAR), and stated that the government would award the contract to the offeror whose offer will be "most advantageous to the Government, price and other factors considered," including an evaluation of technical capability, past performance and price. FAR 52.212-2(a), "Evaluation–Commercial Items (JAN 1999)." The FAR defines a commercial item as "[a]ny item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes," and "(i) [h]as been sold, leased, or licensed to the general public; or (ii) [h]as been offered for sale, lease, or license to the general public . . . ." 48 C.F.R. § 2.101 (Oct. 1, 2004). The solicitation further provided that technical and past performance, when combined, were "significantly more important than cost or price." FAR 52.212-2(a), "Evaluation–Commercial Items (JAN 1999)."

The solicitation provided prospective offerors with the opportunity for a site visit to CCAD prior to the submission of proposals. The opportunity was taken advantage of by Chant, DTBI and Power Supply International (PSI), the contractors which subsequently submitted proposals in response to CCAD's solicitation. Questions from the prospective offerors were submitted in writing, and were answered in writing by amendment to the solicitation, in order for the questions and CCAD responses to be available to all potential offerors. Questions stemming from the site visit were answered by CCAD in amendment 0001 to the solicitation. In addition, Chant submitted additional questions to CCAD via e-mail, to which CCAD responded in amendment 0002 to the solicitation. As noted, Chant, DTBI and PSI submitted proposals to CCAD in response to the solicitation. Chant's price quotation was $844,072.00. Awardee DTBI's price quotation was $1,450,000.00, which was $605,928.00 higher than Chant's quotation. In spite of the higher price, CCAD selected DTBI over Chant.

Grover C. Carrow, a Mechanical Engineering Technician from CCAD's Equipment Engineering Branch, evaluated the three proposals and concluded that "Dayton T. Brown had the only proposal that met the statement of work 100% and offered 'off the shelf' proven test systems and hydraulic power supplies." Mr. Carrow's evaluation stated:

> Both Chant and PSI are offering test systems that have not been designed yet. Although both have hydraulic equipment design backgrounds, neither has produced general purpose test systems before. Neither company expressed how they were going to interface with and be compatible with existing software, fixtures, hydraulic power supply, calibration cart, or project development design station. Both companies expressed the need to have a post award site visit to discuss compatibility and design issues.

Continuing, Mr. Carrow found Chant's proposal to be deficient for several reasons, including: 1) Chant did not demonstrate that its proposed hydraulic test system was off-the-shelf; 2) Chant did not demonstrate that its proposed equipment/software would be compatible with CCAD's existing test stand system; 3) Chant proposed manual controls for adjusting pressure, while CCAD's existing system has automatic controls; 4) Chant's

proposal identified no "circuit return pressure"; 5) Chant did not explain how the "delivery of the semi-automated test procedure" would be performed; 6) Chant's proposal did not clearly indicate whether hardware would be "normally stocked, standard off the shelf packages"; and 7) Chant's proposal did not demonstrate how it would use existing software and support equipment, which contained DTBI's proprietary information. The CCAD contracting officer, Glenda M. Simnacher, concluded that Chant's proposal was deficient because its proposed test stands were not off-the-shelf, and that there were "several critical elements of the specification that were not addressed [by Chant]."

CCAD awarded the contract to DTBI on July 29, 2005, at a price of $1,450,000.00, which was $605,928.00 higher than Chant's proposed price. On September 15, 2005, Chant received a debriefing by telephone on the award to DTBI. As a result of the debriefing, Chant's basic understanding of the award decision was that CCAD did not consider Chant's hydraulic test system to be off-the-shelf, and that CCAD did not know if Chant's software would be compatible with CCAD's existing software. Vice President Philip Chant stated that it was his understanding, from the debriefing, that CCAD believed "it [Chant's proposal] was too much risk for the Government. There was no problem with our past performance as part of the evaluation and our price was, of course, substantially lower."

Chant filed an agency-level protest on September 19, 2005, raising the following issues: (1) the solicitation's twelve-month time for delivery meant that the requested hydraulic test system was not truly an off-the-shelf item, and Chant could meet a twelve-month delivery time frame; 2) Chant's technical proposal had appropriately addressed software compatibility issues and, (3) CCAD did not give appropriate credit to Chant's significantly lower price.

The agency-level protest was denied on November 17, 2005. In her denial, CCAD contracting officer Simnacher stated that:

> The proposal [Chant's] did not provide the agency with enough information in regards as [sic] to how Chant's equipment would be able to run the Corpus Christi Army Depot's test program sets (TPS) that have been written for and run on the Depot's current test stands. It is the Agency's understanding that the software that runs the TPS on the current test stands is proprietary software. Your proposal did not address how Chant would overcome this problem. Conclusory statements that Chant would do so was [sic] not enough.
>
> The [Chant's] Proposal also did not address how Chant would utilize the exiting hydraulic power supply as required by the solicitation. . . .

Chant filed an initial complaint in the United States Court of Federal Claims on November 17, 2005. That bid protest was assigned to another judge of this court. See Chant Eng'g Co. v. United States, No. 05-1243C (Fed. Cl. filed Nov. 30, 2005). CCAD

proposed a re-evaluation of Chant's technical proposal, which resulted in Chant voluntarily dismissing that complaint. See Chant Eng'g Co. v. United States, No. 05-1243C (Fed. Cl. dismissed Dec. 27, 2005). As part of CCAD's subsequent re-evaluation, fourteen questions concerning Chant's proposal were posed to the plaintiff. Although Chant states that it had concerns with the substance of some of the questions, as appearing to be outside the scope of solicitation requirements, Chant responded to all of the questions.

A technical review committee, consisting of Grover Carrow, CCAD's original technical reviewer of the three proposals; Michael Dittrich, an Engineer from CCAD's Equipment Engineering Branch; and Glenn Anderson, a Computer System Analyst from CCAD's Information Technology Division, re-evaluated Chant's proposal.[3] After the re-evaluation, the technical review committee was unanimous that Chant did not meet the minimum requirements of the statement of work. The re-evaluation of Chant's proposal by the technical review committee concluded as follows:

> Section 4 of Chants [sic] proposal "Response to Specification", is the CCAD statement of work removing [the term] "Contractor" [and replacing it] with "Chant". Even doing this, Chant is not 100% compliant with the statement of work.
>
> Chant gave generalities and no specific details pertaining to the questions that were forwarded to them pertaining to their proposal. The committee wanted specific's [sic] on how Chant was going to address these issues. They did not do a good job in convincing the committee they are qualified in supplying the test equipment.
>
> Chant did not ask for details or data pertaining to equipment mention [sic] in the SOW [Statement of Work] during the question/answer period that followed the site visit making it difficult for them to answer some questions at this time. Chant [sic] proposal states the need for a post award site visit to discuss compatibility and design issues and are [sic] offering CCAD a test system design with serial number 0001. The SOW is asking for a [sic] off the shelf[4] proven design.

---

[3] Defendant's proposed facts offered that, "[b]ecause Chant argued in its protest that Mr. Carrow was not qualified to review certain aspects of the proposals, a new technical review committee was formed to re-evaluate Chant's proposal, taking into account Chant's response to the questions posed by the contracting officer." Chant stipulated to the accuracy of defendant's statement.

[4] Defendant's proposed facts offered that "Chant, in its proposal, did not offer test stands and a hydraulic power supply that were off-the-shelf commercial items." Chant stipulated to the accuracy of defendant's statement.

> The [technical review] committee feels Chant did not elaborate on how it was going to deal with proprietary information pertaining to existing software, test equipment, and calibration equipment.[5]
>
> Statement of work paragraph C2.4: Chant failed to state how they are going to comply with compatibility issues. Stated on page 2 of their proposal they "will visit the site after award for the purpose of examining compatibility issues", a sign they do not fully understand the project. Existing equipment it must be compatible with, ATP's [automated test procedures], ect. [sic], are proprietary.
>
> Statement of work paragraph C3.1: Section 2.1 of proposal (page 3) describes manual controls for supply/return pressure and static test pressure. CCAD is asking for a fully automated test system. The existing ATP for OH-58 actuators requires the test system to control all pressures & flows?
>
> The committee feels Chant did not meet the minimum requirements of the SOW.

In a letter to Chant, dated March 24, 2006, CCAD contracting officer Simnacher provided Chant with the results of the re-evaluation of its proposal:

> This is in reference to the Corpus Christi Army Depot's re-evaluation of your offer under RFP W912NW-05-T-0063.
>
> After thorough review of your original quotation and your responses to the questions that were submitted to you on 6 February 2006, it has been determined that the equipment offered by Chant Engineering has not been shown to meet the requirements of the specifications.
>
> Chant's responses to question numbers 2, 4, 10, and 13 [of CCAD's 14 questions] were sufficiently addressed. The response to question number 7 indicated no experience in DITSCAP [DOD Information Technology Security Certification and Accreditation Process]. The responses to all other questions were too general in nature with no specific details pertaining to the question. Chant did not sufficiently explain or address such issues as automated test procedures, dealing with proprietary information, or test

---

[5] Defendant's proposed facts offered that "Chant does not have a license to use or access the proprietary information of DTBI that is contained in the software currently used with the CCAD's testing system, nor has Chant reverse-engineered this software." Chant stipulated to the accuracy of defendant's statement, but added that "DACS [Data Acquisition and Control System] software is available from the manufacturer, Daytronics, Inc."

procedures performed or components tested.

The re-evaluation of Chant's offer is considered complete. No further questions are forthcoming nor will any further information be accepted.

Chant filed the present bid protest, in which Chant sought permanent injunctive relief, enjoining performance of the contract by DTBI, and a re-evaluation of proposals by CCAD. After agreeing to a briefing schedule, plaintiff and defendant filed cross-motions for judgment upon the administrative record, and the intervenor filed an opposition to the plaintiff's motion, followed by numerous supplemental filings from all parties.

**DISCUSSION**

Standing

As a threshold matter, defendant argues that Chant is not an interested party and, therefore, lacks standing to brings this bid protest. According to a decision by the United States Court of Appeals for the Federal Circuit, "[s]tanding to sue is a threshold requirement in every federal action." Sicom Sys., Ltd. v. Agilent Tech., 427 F.3d 971, 975 (Fed. Cir. 2005); see also Galen Med. Assocs., Inc. v. United States, No. 05-755C, 2006 WL 3353774, at *2 (Fed. Cl. Nov. 20, 2006); Pure Power!, Inc. v. United States, 70 Fed. Cl. 739, 744 (2006). The party invoking federal jurisdiction bears the burden of establishing standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002); see also Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1334 (Fed. Cir. 2005).

The Tucker Act provides that this court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491 (b)(1) (2000); see also Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351-52 (Fed. Cir. 2004) ("Under the Competition in Contracting Act (CICA), which governs the bid protest jurisdiction of the General Accounting Office (GAO), a protest may be filed by an 'interested party.' 31 U.S.C. § 3551(1). The CICA explicitly defines the term as 'an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.' 31 U.S.C. § 3551(2)."); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (in order to establish standing, a plaintiff must show that it is an "'actual or prospective bidder [ ] or offeror [ ] whose direct economic interest would be affected by the award of the contract or by failure to award the contract . . . .'" (quoting Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002))), reh'g and reh'g en banc denied (2003) (brackets in original).

Although section 1491(b)(1) does not define the term "interested party," the United States Court of Appeals for the Federal Circuit has adopted the definition set forth in the Competition in Contracting Act, 31 U.S.C. § 3551(2)(A) (2000). According to the court:

> "[P]rejudice (or injury) is a necessary element of standing. . . . [A] potential bidder must establish that it had a substantial chance of securing the award in order to establish standing. . . . In bid protests under the Tucker Act, "we . . . construe the term 'interested party' in section 1491(b)(1) in accordance with the [standing requirements of the] CICA[6] and hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n [of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001)]. Thus, the substantial chance rule continues to apply.

Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d at 1370 (third omission in original); see also Info.Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."). To establish prejudice, a protestor must demonstrate that it had a "substantial chance" to have received the award, had it not been for the agency errors in the procurement. Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (2004).

As discussed below, Chant has not carried its burden of establishing prejudice, that is, Chant has not demonstrated that it had a substantial chance of winning the award, due to its inability to meet the solicitation requirements for an off-the-shelf system that would be compatible with CCAD's existing system. Under the above-cited Federal Circuit precedent, Chant, therefore, is not an "interested party," and does not have standing to bring this protest. Furthermore, as discussed below, it appears that, based on the record before the court, even if Chant did have standing, it likely would not prevail on the merits.

Standard of Review

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act and provided the United States Court of Federal Claims with post-award bid protest jurisdiction for actions filed on or after December 31, 1996. See 28 U.S.C. § 1491(b)(1)-(4) (2000). The statute provides that post-award protests of agency procurement decisions are to be reviewed

---

[6] See 31 U.S.C. § 3551, which offers the following definition: "The term 'interested party', with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."

under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970) and the line of cases following that decision. See, e.g., Galen Medical Assocs., Inc. v. United States 369 F.3d at 1329 (citing Scanwell for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law."), reh'g denied (2004); Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1351 ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001); Textron, Inc. v. United States, 74 Fed. Cl. 11, 19-20 (2006); Info. Sci. Corp. v. United States, 73 Fed. Cl. 70, 95-96 (2006).

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2000)[7]; see also Bannum, Inc. v. United States, 404 F.3d at 1351 ("[T]he inquiry is whether the

---

[7] The full language of section 706 of the APA provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

[government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) (2000))). In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit has discussed specifically subsections (2)(A) and (2)(D) of 5 U.S.C. § 706. See Impresa Contruzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5; see also NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (2000))); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1085 (Fed. Cir. 2001) ("The APA provides that a reviewing court must set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (Supp. V 1999)."), reh'g and reh'g en banc denied (2001); RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1290 (Fed. Cir. 1999).

In Impresa Construzioni Geom. Domenico Garufi v. United States, the court wrote:

> Under the APA standards that are applied in the Scanwell line of cases, a bid award may be set aside if either: (1) [T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. . . . When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," id., and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994). When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." Kentron [Hawaii, Ltd. v. Warner,] 480 F.2d [1166,] 1169 [(D.C. Cir. 1973)]; Latecoere, 19 F.3d at 1356.

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33

(selected citations omitted); see also Banknote Corp. of Am. v. United States, 365 F.3d at 1351; OMV Med., Inc. v. United States, 219 F.3d 1337, 1343 (Fed. Cir. 2000).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995-96 (Fed. Cir. 1996); Textron, Inc. v. United States, 74 Fed. Cl. at 20; Labat-Andersen Inc. v. United States, 50 Fed. Cl. 99, 106 (2001); Emery Worldwide Airlines, Inc. v. United States, 49 Fed. Cl. 211, 222, aff'd, 264 F.3d 1071 (Fed. Cir.), reh'g and reh'g en banc denied (2001); Dynacs Eng'g Co. v. United States, 48 Fed. Cl. 614, 619 (2001); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999), appeal dismissed, 6 Fed. Appx. 867 (Fed. Cir. 2001). The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see also In re Sang-Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The agency must present a full and reasoned explanation of its decision . . . . The reviewing court is thus enabled to perform a meaningful review . . . . "); Textron, Inc. v. United States, 74 Fed. Cl. at 20.

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); see also Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 523 (2003) (quoting Honeywell, Inc. v. United States, 870 F.2d at 648 (quoting M. Steinthal & Co. v. Seamans, 455 F.2d at 1301))). As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a

> narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (citations omitted); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001) ("[T]he arbitrary and capricious standard is extremely narrow and . . . . [i]t is not for the Federal Circuit to substitute its own judgment for that of the Board.") (citations omitted); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang-Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. United States, 4 F.3d 955, 959 (Fed. Cir. 1993); Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 Fed. Appx. 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985))); Redland Genstar, Inc. v. United States, 39 Fed. Cl. 220, 231 (1997); Mike Hooks, Inc. v. United States, 39 Fed. Cl. 147, 154 (1997); Cincom Sys., Inc. v. United States, 37 Fed. Cl. 663, 672 (1997); Commercial Energies, Inc. v. United States, 20 Cl. Ct. 140, 145 (1990) ("In simple terms, courts should not substitute their judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably.") (citations omitted)).

Similarly, in E.W. Bliss Co. v. United States, the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. See Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993); cf. Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason . . . even if the Board itself might have chosen a different bidder"); In re General Offshore Corp., B-251969.5, B-251969.6, 94-1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where

> an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).
>
> * * *
>
> Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings . . . which involve discretionary determinations of procurement officials that a court will not second guess. See Lockheed Missiles & Space Co., 4 F.3d at 958; Grumman Data Systems Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.") . . . .

E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); see also JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir.), reh'g denied (2002).

In a negotiated procurement, contracting officers are generally afforded even greater decision making discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); E.W. Bliss Co. v. United States, 77 F.3d at 449; and Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; Am. Tel. and Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002), cert. denied, 540 U.S. 937 (2003); Lockheed Missiles & Space Co. v. United States, 4 F.3d at 958; Cybertech Group, Inc. v. United States, 48 Fed. Cl. at 646 ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Hayes Int'l Corp. v. United States, 7 Cl. Ct. 681, 686 (1985) ("It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement . . . ." (citing Sperry Flight Sys. v. United States, 212 Ct. Cl. 329, 339-40, 548 F.2d 915 (1977))). In Burroughs Corporation v. United States, the court described the broad discretion afforded a contracting officer in a negotiated procurement as follows:

> Remarking on the contracting officer's discretion in negotiation, the court in Sperry Flight Systems Division v. United States, 212 Ct. Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "the decision to contract - a responsibility that rests with the contracting officer alone - is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for . . ." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the

> action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising.

Burroughs Corp. v. United States, 223 Ct. Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1555 (Fed. Cir. 1995); JWK Int'l Corp. v. United States, 49 Fed. Cl. at 388; Mantech Telecomms. and Info. Sys. Corp. v. United States, 49 Fed. Cl. at 64.

The United States Court of Appeals for the Federal Circuit also has stated that:

> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 617 F.2d 590, 598 (Ct. Cl. 1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69 . . . .

Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d at 958-59; see also Galen Medical Assocs., Inc. v. United States, 369 F.3d at 1330; Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995; Grumman Data Sys. Corp. v. Widnall, 15 F.3d at 1046.

Barring arbitrary and capricious behavior or a violation of law, the wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. See Compubahn, Inc. v. United States, 33 Fed. Cl. 677, 682-83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted)); see also Textron, Inc. v. United States, 74 Fed. Cl. at 20 (in which the court considered technical ranking decisions "minutiae of the procurement process" not to be second guessed by a court). As noted above, the question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but rather, whether the conclusions reached by the agency lacked a reasonable basis and were, therefore, arbitrary or capricious, in which case, courts have a role to review and instruct.

To prevail in a bid protest case, the protester not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Recognizing the two-step analysis of bid protest cases, the Federal Circuit has stated that:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351. In describing the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (1999) (citation omitted in original); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d at 1370; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corporation v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

> This is a refinement and clarification of the "substantial chance" language of CACI, Inc. Fed., 719 F.2d [1567,] 1574 [(Fed. Cir. 1983)].

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (1996); see also Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum. . . . To establish prejudice Bannum [the plaintiff] was required to show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors in the bid process." (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; and Statistica, Inc. v. Christopher, 102 F.3d at 1582)); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1331 ("To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'" (quoting Statistica, Inc. v. Christopher, 102 F.3d at 1582); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d at 1370 (using the "substantial chance" standard); OMV Med., Inc. v. United States, 219 F.3d at 1342 (invoking a "reasonable likelihood" of being awarded the contract test); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (also using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Info. Sci. Corp. v. United States, 73 Fed. Cl. at 96 (also using a "substantial chance" test); Park Tower Mgmt., Ltd. v. United States, 67 Fed. Cl. 548, 559 (2005) (also using a "substantial chance" test).

Commercial, Off-the-Shelf Requirement Applied to Chant

Defendant argues that Chant failed to meet the technical requirements of the solicitation and, therefore, that Chant cannot show prejudice because it did not have a substantial chance of winning the CCAD contract. In this regard, the solicitation, at section C.13.2, required that all hardware "shall be normally stocked, standard off the shelf packages shown in a current published catalog. One of a kind, prototype or discontinued models are not acceptable." "Off-the-shelf" is defined in the FAR as "an item produced and placed in stock by a contractor, or stocked by a distributor, before receiving orders or contracts for its sale. The item may be commercial or produced to military or federal specifications or description." 48 C.F.R. § 46.101 ("*Off-the-shelf*") (Oct. 1, 2004).

The solicitation form itself was titled "Solicitation/Contract/Order for Commercial Items," and included FAR 52.212-2(a), "Evaluation–Commercial Items (JAN 1999)," as well as other commercial item clauses, reflecting that the CCAD procurement was for commercial items. The FAR defines a "commercial item" as "[a]ny item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes," and "(i) [h]as been sold, leased, or licensed to the general public; or (ii) [h]as been offered for sale, lease, or license to the general public . . . ." 48 C.F.R. § 2.101 ("*Commercial item*") (Oct. 1, 2004).

The issue of off-the-shelf commercial items was the subject of a 1999 bid protest brought by Chant before the Government Accountability Office (GAO) against a CCAD procurement of electro-hydraulic servo valve test stations. See Chant Eng'g Co., Comp. Gen. B-281521, 99-1 CPD ¶ 45, at 1 (1999). Chant's proposal, which was the subject of the GAO protest, had stated that its test station would have all of the required features, but other than that assertion, the GAO found insufficient indicia accompanying the proposal for CCAD to conclude that Chant test stations would be off-the-shelf commercial items, as required by the solicitation. Id. at 3-4. The GAO decision, which dismissed Chant's protest, id. at 1, 5, reasoned that:

> Chant's proposal provides no evidence that its proposed test station has at least been offered for sale, lease, or license to the general public or that it otherwise complies with the FAR § 52.202-1(c) definition[8] of "commercial item." Instead of offering "commercial off the shelf equipment," Chant is merely offering to fabricate, for the first time after award, a customized test station in compliance with the specification . . . . Thus, it is apparent from Chant's proposal that its proposed test station is not based on any existing, commercially available model. . . .
>
> One of the purposes of a solicitation requirement for a commercial product is to avoid the design and engineering risks associated with new equipment by procuring a commercially proven item. New equipment like Chant's proposed test station, which may only become commercially available as a result of the instant procurement, clearly does not satisfy the RFP requirement for commercial off-the-shelf (existing) equipment.

Chant Eng'g Co., 99-1 CPD ¶ 45, at 4 (footnote and citations omitted).

As with the 1999 GAO protest Chant brought against CCAD, Chant's current protest against CCAD involves a finding by the CCAD of a failure on Chant's part to propose off-the-shelf commercial items. In this regard, the latest CCAD evaluation stated that, "[b]oth Chant and PSI are offering test systems that have not been designed yet. Although both have hydraulic equipment design backgrounds, neither has produced general purpose test systems before." Chant, in fact, has acknowledged that it offered test stands to CCAD which were not off-the-shelf commercial items. Noting that Chant proposed a test system with "serial number 0001," defendant proposed the following fact in support of its motion

---

[8] Essentially the same definition of "commercial item" identified and quoted by the GAO at FAR 52.202-1(c) for its1999 GAO bid protest decision, see Chant Eng'g Co., 99-1 CPD ¶ 45, at 1-2 n.1, is contained at 48 C.F.R. § 2.101 (Oct. 1, 2004) (quoted above) for purposes of Chant's protest before this court. The October 1, 2003 FAR retained the location of the definition of commercial item at FAR 52.202-1(c); the October 1, 2004 FAR moved the definition to FAR 2.101 ("Definitions"). The substance of the definitions from the two locations in the FAR is the same.

for judgment upon the administrative record: "Chant, in its proposal, did not offer test stands and a hydraulic power supply that were off-the-shelf commercial items." Chant's response to the defendant's proposed fact was as follows: "Undisputed. Chant's offered test stands were not 'off the shelf commercial items.'"

The court finds, therefore, that CCAD correctly concluded that Chant did not propose an off-the-shelf commercial item, as required by the solicitation. Based on this finding alone, the court must conclude that Chant was not responsive to the requirements of the solicitation, did not have a substantial chance, or any chance, of winning the award and, therefore, was not prejudiced by award to DTBI. With no chance of winning the CCAD competition, Chant is not an interested party for purposes of a bid protest in this court, and lacks standing. On this ground alone, Chant's protest must be dismissed, with prejudice.

<u>Commercial, Off-the-Shelf Requirement Applied to DTBI</u>

Chant, nevertheless, argues that, if it is not offering an off-the-shelf commercial item, then neither is DTBI. At oral argument on the cross-motions for judgment upon the administrative record, Chant stated its position:

> [T]he defendant argues that [Chant] is not offering a commercial item, and you know, we responded to that by pointing out that if we're not supplying a commercial item, neither is the Intervenor supplying a "commercial" item. If you are using the definition of commercial that the government offers, that it's been sold, leased or offered for sale to the general public, then our item is no more or less a commercial item than Dayton Brown's item. . . . I'm not going to sit here and say that ours has been sold, offered for sale, leased to the "general public[,]" but I would also submit though that that's got to be interpreted equally. . . . Now, the government's answer to that is, oh, well, they [DTBI] sold them to CCAD before. Well, CCAD is not the general public. It's the military. . . . I don't believe that satisfies the definition of a commercial item. The Army is not the general public.

In this regard, DTBI's proposal stated as follows:

> **1.3 PROPOSED EQUIPMENT**
> Dayton T. Brown, Inc. has proposed quantity 3 Model LE 6000R General Purpose Hydraulic Test Stands, NSN 4920-01-399-4181, and quantity 1 Model CP/S-6250 Remote Hydraulic Power Supply, NSN 4920-01-271-3423. These items are identical to those currently in use at CCAD, and are fully compliant with the requirements of the Solicitation.

CCAD, the Corpus Christi Army Depot, is an Army unit, whereas the definition of a commercial item includes "[a]ny item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other

than governmental purposes," and "(i) [h]as been sold, leased, or licensed to the general public; or (ii) [h]as been offered for sale, lease, or license to the general public . . . ." 48 C.F.R. § 2.101 ("*Commercial item*") (Oct. 1, 2004). Chant argues that the Army is not the general public, and defendant agrees, affirming at oral argument that, for purposes of defining commercial items, "[t]he Army is not part of the general public."

DTBI's proposal to CCAD generally noted that it had "delivered test systems" to non-governmental, industrial buyers, naming Rockwell International Corporation, Long Beach, California; Douglas Aircraft Corporation, Long Beach, California; Vickers Corporation, Jackson, Mississippi; Parker/Abex Aerospace, Oxnard, California; and American Airlines, Tulsa, Oklahoma. More specifically, as reflected in supplemental materials provided for the record by defendant and intervenor, the Model LE 6000R General Purpose Hydraulic Test Stand and Model CP/S-6250 Remote Hydraulic Power Supply, proposed by DTBI for the CCAD procurement in question, are offered for sale to the general public on DTBI's website, at www.daytontbrown.com. In addition, DTBI provided advertising materials offering for sale to the general public the specific test systems offered to CCAD for the procurement in question. Finally, other supplemental materials provided to the court by DTBI indicate the sale, in 1996, of a Model LE 6000R General Purpose Test Stand to a private South Korean company, Tong Myung Heavy Industries Co., Ltd. With the assistance of this supplemental material, the court finds that the test systems offered by DTBI for the CCAD procurement were commercial items sold or offered for sale to the general public, and not exclusively sold or offered for sale to governmental entities.

Chant further argues that a visual inspection of the Hydraulic Test Stands, Model LE 6000R, DBTI offered for the CCAD procurement indicates that the test stands are configured differently from the test stands currently being used at CCAD. For example, Chant argues that DTBI's website shows a test stand with seven pressure gauges across the top and manual shutoff valves along the front face; the test stands at CCAD have gauges in different configurations and multiple connection ports and flow meters. Intervenor responds that Chant is comparing a DTBI Model LE 6000R test stand from DTBI's website to a CCAD test stand that is not a Model LE 6000R, which would explain the differences. Defendant, for its part, characterizes any differences as merely aesthetic. The question, however, is whether the test stands offered for the CCAD procurement are commercial, off-the-shelf systems. The court's earlier discussion concluded that Chant's are not commercial, off-the-shelf systems, and that DTBI's test stands are. Chant has not carried its burden to demonstrate the fallacy in these conclusions.

Chant further argues that the Model LE 6000R General Purpose Hydraulic Test Stand proposed by DTBI does not meet the specifications of the solicitation at issue. The CCAD solicitation, at section C.4.2.d., requires that circuit 1 of the test stand have a maximum flow rating of 85 gallons per minute (gpm). Chant accessed the DTBI website, which showed a 60 gpm maximum flow for circuit 1 of the Model LE 6000R. Chant also notes that a marketing brochure for the Model LE 6000R General Purpose Hydraulic Test Stand, in contrast, shows a maximum flow for circuit 1 as 90 gpm. Chant argues that the

60 gpm version may be the commercial version, and the 90 gpm test stand may be the military version, and offers the conclusion that the military version, therefore, is not a required, commercial, off-the-shelf system. Intervenor responds that the 60 gpm flow rate is merely a typographical error on the website, which has been corrected, and that the catalog and brochure provided to the court and to customers have the correct flow rate noted by Chant, of 90 gpm, a rate which exceeds CCAD's specification requiring 85 gpm. In supplemental briefing, Chant finds it hard to believe that an experienced contractor like DTBI could make a typographical error on its website, showing 60 gpm rather than 90 gpm. The court, however, will accept the sworn, unrefuted declaration from DTBI's Engineering Manager - Test Systems, which is contained in the record, and which states that the 60 gpm was a typographical error, and 90 gpm is the correct figure, as well as DTBI's marketing brochures and the current DTBI website, which list the 90 gpm figure. A flow rate of 85 gpm is a requirement of the contract with which DTBI has indicated it will comply, and the record contains support for CCAD's conclusion that the requirement will be met.

After reviewing the supplementations to the record provided by the parties, the court concludes that DTBI offered test systems for the CCAD procurement which were commercial items sold or offered for sale to the general public, and Chant did not. CCAD's evaluation, therefore, rejecting Chant's proposal, was not arbitrary or capricious. Chant cannot show a substantial chance for the award, and absent a demonstration of such prejudice, has no standing to bring this protest. This finding is independent of the discussion below on software compatibility.

<u>Compatibility Requirements</u>

CCAD also found that Chant did not meet the minimum requirements of the solicitation on the requirement that test stands be compatible with CCAD's existing software and equipment. Defendant argues that the requirement that the test stand be compatible with CCAD's current system is an "absolutely necessary" requirement, that Chant's failure to meet the requirement rendered Chant ineligible for the award and, therefore, without a substantial chance for the award. Without being able to demonstrate prejudice, defendant argues that Chant is without standing to protest the contract award to DTBI.

With respect to compatibility, the CCAD solicitation, at section C.2.4, required that offerors "[p]rovide complete compatibility with existing CCAD general purpose test fixtures, automated test procedures and with existing local area test system network." CCAD solicitation section C.4.5. stated that: "DACS [Data Acquisition and Control System] system hardware shall be compatible with existing DACS hardware in existing general purpose hydraulic test systems such that, if required, signal conditioner cards may be interchanged among the systems." CCAD solicitation section C.4.6.3.3. required that: "Application software shall conform to and interface with the existing software in the general purpose hydraulic test system presently installed at CCAD." CCAD solicitation section C.4.6.4.1 stated that an offeror's proposed system "shall include a current copy of the DACS system maintenance software available from the DACS system manufacturer."

DTBI's proposal stated that it had "exclusive proprietary rights to the DACS software programs . . . ." The record does not reflect that Chant obtained or even sought a license to use the DACS software on its hydraulic test system, or that it planned to use reverse engineering to address any proprietary software issues. Chant, instead, responds that it assumed the requisite DACS systems maintenance software would be made available to Chant from the manufacturer. Chant's proposal essentially recited CCAD's specifications. For example, as noted above, the CCAD solicitation stated that "[a]pplication software shall conform to and interface with the existing software in the general purpose hydraulic test system presently installed at CCAD," and Chant's proposal stated that "[a]pplication software will conform to and interface with the existing software in the general purpose hydraulic test system presently installed at CCAD." Chant also denies that DTBI is the manufacturer of the DACS software. Chant believes that DTBI's claim to the DACS software is "spurious," and that the DACS software is a "standard software package [which can be] purchased from a third party (Daytronics Inc.)." DTBI, in response, reiterates that the DACS software is proprietary to DTBI.

In this regard, the record contains the declaration of Glenn Anderson, a Computer System Analyst with CCAD, who also was on the committee that re-evaluated Chant's proposal. Mr. Anderson provides the following explanation, which the court finds relevant:

> CCAD currently owns and operates five multi-purpose, hydraulic, servo test stands and three dedicated hydraulic pump test stands, all of which were purchased from and are supported by DTBI. Each test stand is installed with two pieces of developed software: one piece is DTBI-developed software that operates within the Daytronics System 10 and the other piece is Windows systems software that is coded and operating under HT Basic. DTBI's developed software was created by DTBI as a commercial Data Acquisition Control System ("DACS") software. DACS is a generic term for software that may be configured to collect, analyze, and control large amounts of data using feedback control to the machine. Daytronics System 10 is one of many types of commercially-available DACS that interfaces at the sensor level for proportional, integral, derivate software control. There are additional Hewlett Packard 488 bus DACS circuit boards that are plugged into the windows computer. Portions of the HT Basic software code are developed to communicate with these boards as well. Although Daytronics System 10 may be purchased commercially, the software arrives in the box essentially un-configured. Therefore, to use the Daytronics System 10 software to collect and analyze data, it must be programmed to fit the needs of the purchaser based upon the application because any number of circuit boards may be installed into a shared backplane bus connection system. When that programming is developed by a private company, the codes underlying that program become the proprietary material of that company. For example, the Daytronics System 10 software can be analogized to a small computer found in most modern cars. The software codes directing that computer to operate a particular

> car is the proprietary, intellectual property of the car manufacturer.
>
> Similarly, in this case, DTBI has programmed the Daytronics System 10 and the HT Basic software to operate CCAD's test stands. The Government has a license to use DTBI's programmed software.
>
> When a test stand first arrives at CCAD, with DTBI's programmed software and the Windows systems software installed, a team of people called the Configuration Management Board ("CMD"), comprised of Quality Control, Engineering Departments, and Information Technology, Calibration and Plant Maintenance Support, examines the hardware and software set-up and compares it to flight safety standards set forth in military service manuals. . . . Once the team has ensured that the test stand meets the required safety and operational performance standards, the configurations are locked in place and the test stand is approved for use . . . .
>
> Each test stand is two-way linked to a database server via a local area network that holds the records for each variety of aircraft component along with an archive of production records. The database server determines the set of tests to be run on a particular component based upon its configuration frozen records. The database server stores portions of DTBI's programmed DACS code. Upon the completion of each test, a data record is stored in the archive for each specific aircraft component.
>
> Periodically, the test stands must be calibrated to ensure that the test stands are meeting the Government's Master Reference Standard. . . . The calibration is similar to the testing that occurs regularly on gas pumps to ensure that the gallons represented on the pump are truly an accurate measure. . . . The calibration department uses portable testing equipment that is hooked up to each test stand. A structured testing procedure is then carried out to ensure that the readings are within a specified calibration range. . . . Once the calibration is completed, the configurations of the test stand are frozen again, and the test stand is approved for continued production use.
>
> Every two test stands are connected to a power source of hydraulic pressure. The power source requires that the test stand by able to interconnect with the plumbing and pipes comprising the power source.

Computer system analyst Anderson's declaration was quoted extensively, as providing necessary background for understanding the compatibility issues. As noted, each test stand is linked to a database server which determines the tests to be run on aircraft components and which stores records for each component. Because the database server stores portions of DTBI's programmed DACS code, defendant argues that CCAD properly concluded that Chant's proposal failed to explain how its proposed test stand would interact

with the database server which was operating on DTBI's proprietary software. Also as noted above, the test stands must be calibrated to standards by the calibration department. Defendant argues that Chant's proposal did not address whether its proposed test stand could operate with CCAD's existing calibration equipment, which is being used to calibrate test stands designed and supported by DTBI and its proprietary software. Also as noted above, test stands are connected to a power source, which requires that the test stands be able to interconnect with the plumbing and pipes of the power source. Defendant further argues that Chant's proposal did not demonstrate that its proposed test stands were capable of connecting to the plumbing and pipes of CCAD's power source.

A CCAD technical review of Chant's proposal, by a review committee, including computer system analyst Anderson, concluded that Chant did not meet the minimum requirements of the solicitation. The pertinent part of that technical evaluation follows:

> The committee feels Chant did not elaborate on how it was going to deal with proprietary information pertaining to existing software, test equipment, and calibration equipment.
>
> Statement of work paragraph C2.4: Chant failed to state how they are going to comply with compatibility issues. Stated on page 2 of their proposal they "will visit the site after award for the purpose of examining compatibility issues", a sign they do not fully understand the project. Existing equipment it must be compatible with, ATP's, ect. [sic], are proprietary.

The compatibility issue is not a new one. As early as 1995, there was a protest before the Government Accountability Office not involving Chant, of CCAD's sole source purchase of hydraulic test stands from DTBI. See AAI ACL Techs., Inc., B-258679, B-258679.4, 95-2 CPD ¶ 243, 1995 WL 699976 (Comp. Gen. Nov. 28, 1995). The GAO denied the protest, upholding the sole source to DTBI based on compatibility requirements:

> As explained by the Army, the "data" referenced in the J & A [Justification and Approval] is the software which runs the DTB equipment. This software is unique to DTB and, because DTB owns the exclusive rights to the software, it cannot be reproduced by AAI ACL or any other hydraulic test stand manufacturer without a complete reverse engineering effort.
>
> Further, the Army states that given the current CCAD backlog of hydraulic components requiring testing and repair, a reverse engineering effort is not feasible in this case because of the time required to reverse engineer the software and the resulting interruption to the current production line, the greater expense to the government of purchasing a software developed by means of a research and development effort, and finally, the potential risk that even if reverse-engineered, the resulting software solution might not be completely interchangeable with or equivalent to the DTB software which is currently used to run the UH-60 test stand.

> As explained by the CCAD officials, the unification of automated hydraulic test stands through a centralized computer system will improve the efficiency of testing and repairs, and will enable the government to "save hundreds of thousands of dollars" because of the speed of testing production and the ability to share software, and track repairs and test results through the depot system. The manual stand-alone testing stations do not offer this capability. There is no dispute by any of the parties that the Army's desire for an integrated automated hydraulic testing station system is improper. Nor does the protester disagree that, absent a reverse-engineering effort, only DTB software will run DTB equipment.

AAI ACL Technologies, Inc., 1995 WL 699976, at *5 (footnote and citations omitted).

In the present procurement, CCAD originally had executed a Justification and Approval, in support of a sole source award to DTBI. Part of the rationale for the Justification and Approval was that:

> Dayton T. Brown (DTB) is the only source that has the technical knowledge and proprietary engineering data to provide test systems that will provide utilization of current support equipment and will provide standardization for all test systems in the hydraulic test arena. . . . Benefits to CCAD in awarding this procurement package to DTB include but are not limited to:
>
> Ability to utilize current support equipment/software:
> Calibration Cart ($150k) – DTB has proprietary rights to the design and software on this cart. A calibration cart is required to calibrate this type of test equipment, and CCAD already has one.
>
> Project Development Design Station (PDDS) ($200k) – DTB has proprietary rights to the design and software on this design station. . . .

The Justification and Approval also contained a paragraph titled "Efforts to Obtain Competiton," which stated that: "There have been no efforts to obtain competition for the reasons stated in paragraph 5 [above], and due to the fact that DTB is unwilling to sell the proprietary data. Nevertheless, this requirement will be synopsized in the FedBizOps and any inquiries will be considered."

At oral argument before this court, intervenor's counsel explained that after CCAD announced the intention to procure test stands sole source, "they got three offerors – three potential offerors [Chant, DTBI, and Power Supply International] responded saying we're interested in trying to provide this kind of equipment. It makes sense to me as a logical matter if the agency believing [its] sole source, but hearing three people say, three separate companies say we can provide it, at least entertain it, to open it up. It makes some sense to me." In any event, three proposals were received and evaluated by CCAD. Chant's posture on compatibility was reflected in its proposal with these words: "A key part of the

requirements is compatibility with existing CCAD test stands. Chant Engineering personnel will visit the site soon after award for the purpose of examining compatibility issues." CCAD was understandably unwilling to accept the risks involved in discussing compatibility and design issues, post-award, with not even an indication from the plaintiff of a plan to address compatibility or likelihood of an ability to do so.

The court finds that the solicitation contained compatibility requirements with the existing test stands, which were not unreasonable under the circumstances; that CCAD's existing test stands contained both commercially available software and proprietary software, impacting evaluation of the compatibility requirement; and that Chant did not demonstrate to the CCAD evaluators of Chant's proposal satisfactory compliance with the compatibility requirements of the solicitation. Under CCAD's solicitation, Chant had a duty to demonstrate how its proposed test stands were compatible with CCAD's existing system, and was unable to do so satisfactorily. Based on this finding alone, the court must conclude that Chant was not responsive to the requirements of the solicitation, did not have a substantial chance of winning the award, was not prejudiced by award to DTBI and, therefore, lacks standing. As with the commercial, off-the-shelf requirement, Chant's protest must be dismissed, with prejudice, on this independent ground. Because Chant lacked standing to protest under the facts and circumstances of this procurement, the court does not reach Chant's arguments challenging CCAD's evaluation of the proposals.

## CONCLUSION

For the foregoing reasons, the court concludes that the plaintiff lacks standing to protest the award to DTBI under CCAD solicitation W912NW-05-T-0063. The plaintiff's complaint is **DISMISSED**, with prejudice. The clerk's office shall enter **JUDGMENT** for defendant and intervenor in accordance with this opinion. Because this opinion is issued under seal, within fourteen days after the opinion is issued, the parties shall submit a joint, proposed, redacted version of the opinion for release to the public. No costs.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**